IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 16, 2019

## STATE OF TENNESSEE v. ZACKARY JAMES EARL PONDER

**Appeal from the Circuit Court for Stewart County**
**No. 2016-CR-85     David D. Wolfe, Judge**

_____

### No. M2018-00998-CCA-R3-CD

_____

The defendant, Zackary James Earl Ponder, appeals his Stewart County Circuit Court jury convictions of first degree premeditated murder and aggravated assault, claiming that the trial court erred by admitting into evidence three photographs of the victim, by refusing to allow the defendant pretrial access to the criminal history of a State witness, by limiting his cross-examination of the investigating officer, by permitting the prosecutor to express his personal opinion during closing argument, and by failing to address "the fine portion of the defendant's sentence." He also challenges the sufficiency of the evidence for his conviction of first degree murder. Although we conclude that portions of the State's closing argument were improper, we deem the error harmless. We detect clerical error in the judgment for the defendant's conviction of aggravated assault that necessitates the entry of a corrected judgment for that count. Otherwise, the judgments of the trial court are affirmed.

### Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed; Remanded

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Chase T. Smith, Clarksville, Tennessee, for the appellant, Zackary James Earl Ponder.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Assistant Attorney General; W. Ray Crouch, Jr., District Attorney General; and Dani Bryson, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

The Stewart County Grand Jury charged the defendant with first degree premediated murder and aggravated assault related to the March 2016 death of the victim, Seth Michael Allen Brabant.

Cody Lancaster, who was in the same Army unit as the defendant and the victim, testified that in March 2016, the victim, who was in the process of separating from his wife, lived with Mr. Lancaster. Mr. Lancaster's former fiancée, Jillian Valencia, and Kent Carpeno also lived in the home. On the evening of March 5, 2016, they had a party at the residence, and the defendant attended. The victim "was having a tough night" because he could not reach his estranged wife and, as a result, the victim was "aggressive with everybody." The victim was also drinking heavily. At some point, the victim and Mr. Carpeno began to argue, and, when Mr. Lancaster tried to intervene, the victim struck Mr. Lancaster, "and that's when all hell broke loose." Mr. Lancaster described a melee involving several people with "fists flying." He could not recall how the brawl ended, saying, "I mean as quickly as it started it stopped." He recalled that the defendant, who had not been drinking and who did not participate in the fracas, held Mr. Lancaster down because he did not want Mr. Lancaster to fight the victim.

After the fight ended, Mr. Lancaster and Ms. Valencia went into Mr. Lancaster's bedroom to talk. Mr. Lancaster said that Ms. Valencia had been struck during the altercation and that he was upset because he had been unable to protect her. Sometime later, the victim got up to go to the restroom, and the defendant said "something about, hey, I'm going to take him, you know, to his wife's." The defendant and the victim then left together with the defendant's "helping [the victim] out the door." Mr. Lancaster said that, as far as he knew, the defendant was taking the victim to visit the victim's estranged wife. The defendant telephoned Mr. Lancaster on the following day "saying that he really wanted to talk to [Mr. Lancaster] about something," but Mr. Lancaster told him that he was too upset about an argument he had had with Ms. Valencia on the previous evening to meet with the defendant.

Jillian Valencia testified that on March 5, 2016, she arrived home from work at approximately 11:30 p.m. to find "the guys drinking like they always do, liquor and beer." Mr. Lancaster was downstairs with the victim, who was "completely distraught" because his estranged wife had gone on a date with another man. She said that the victim was "cursing, saying he was done. Just belligerent and completely heartbroken." Ms. Valencia said that the victim "was pretty drunk" but that she did not drink alcohol, "[e]specially not with the guys." She attempted to console the victim, and he and Mr. Lancaster eventually went upstairs to do "the whole [m]ilitary drinking

thing," which she described as involving "one fifth of Fireball . . . , a beer bong and a whole bunch of beer." She said that she "never had any fun," so she went to bed.

Ms. Valencia testified that she awoke around 3:00 a.m. "to a fight going on," saying, "There's people screaming at each other, nothing out of the ordinary." When she got up to investigate, she saw the victim "standing over [Mr.] Carpeno who is sitting on the couch and he is just screaming at him. Just yelling at the top of his lungs, belligerent." When Mr. Lancaster asked the victim to leave, the victim "immediately threw a punch at" Mr. Lancaster. Before Mr. Lancaster could retaliate, the defendant "grabbed him and put him in a hold because that's what friends do." When Ms. Valencia attempted to intervene, the victim struck her with his elbow as he threw a punch at someone else. Ms. Valencia said that the fight did not last long and that, after it was over, she pulled Mr. Lancaster into the bathroom to calm down.

When he saw that Ms. Valencia's lip was bleeding, Mr. Lancaster left the bathroom. Shortly thereafter, the victim came into the bathroom, and Ms. Valencia asked him to back up because she "was kind of scared." At that point, the victim said that he just needed to use the restroom. Ms. Valencia recalled that the defendant "actually came and saw that" she was upset and "up against the wall asking [the victim] to get away." She said that the defendant told the victim to step away from her.

Ms. Valencia left the bathroom and went downstairs to calm Mr. Lancaster. While she was downstairs, she heard the victim "upstairs just punching walls and punching windows." She said that "[t]here were holes all over the house because he was upset, he was belligerent." A short time later, the defendant came downstairs and said "like, all right, guys, I'm going to get him out of here. I'm going to try to diffuse the situation, get him out of here, you guys are completely pissed off at him, I'll take care of it and I'll take him with me." Ms. Valencia did not see the pair leave because she had begun to argue with Mr. Lancaster, who had, by that time, "punched [the] TV."

Ms. Valencia testified that the next time she saw the victim, he was in the hospital "on a heart monitor . . . keeping him alive." She said that the victim "was beat up pretty good and you could see the strangle marks from the shoestring around his neck." She stated that the marks around the victim's neck did not come from injuries he received during the fight, saying that she had seen him immediately after the fight and that "he had like maybe a bloody nose and a couple of scrapes." She said that the victim's face was "black and purple and swollen" and that he did not sustain those injuries during the fight.

Gary Smith testified that on the morning of March 6, 2016, he was driving to the store from his home on Glen Holliday Road in Stewart County, which he described

as "a rock road" with "cornfields on either side," when he "found the gentleman in the middle of the road." He stopped his truck, got out, and looked around "in the trees and to the hill to the side . . . just to make sure nobody else was around. It was kind of strange." Mr. Smith called out to the man, but the man did not respond. When he got close, Mr. Smith saw that the man was "kind of trying to breathe," so Mr. Smith knelt down and "tried to turn his head a little bit, because it was face down in the dirt." Mr. Smith telephoned 9-1-1 and "decided to roll him onto his side to maybe try to help him." While he was on the telephone with 9-1-1, Mr. Smith saw a "rope or shoelace" around the victim's neck. Mr. Smith cut the shoelace with a knife he had in his pocket, and the "color came back into [the man's] face a little bit, but he was still belaboring trying to breathe."

Law enforcement officers and emergency medical personnel responded to Mr. Smith's call, and Mr. Smith remained on the scene until he was released by the investigating officer. Officers photographed and collected the shoelace that Mr. Smith had cut from the victim's neck.

The victim was transported by ambulance to a predetermined landing area, where he was taken aboard an air ambulance to be transported to Vanderbilt University Medical Center. Vanderbilt Life Flight Nurse Joe Brentise testified that the victim, who had no identification, "wasn't keeping his airway open on his own" and, as a result, "was in a life[-]threatening condition." When Mr. Brentise performed "a sternal rub," the victim responded with "decorticate posturing," which Mr. Brentise described as an involuntary response indicative of brain injury. The victim's pupils were unequal, which also indicated a brain injury. The victim had "bruising to the left of his forehead," "marks around his neck," and "abrasions to his left foot." Mr. Brentise placed an intubation tube and administered medications that sedated the victim before the flight took off for Vanderbilt Medical Center.

Doctor Raeanna Adams first saw the victim on March 7, 2016, after the victim had been admitted into the trauma unit at Vanderbilt University Medical Center. During a neurological examination, the victim had "abnormal flexion of his left lower extremity to pain" but "[n]o other spontaneous movement." Although the victim "occasionally would just open his eyelids to pain," "he had no blink to threat," and "his eyes were not tracking." Doctor Adams said that these signs were "consistent with brain injury" "[t]hat results from a time period where there's not enough oxygen for the brain." Testing established the presence of "[v]ery thick mucus . . . which did grow out some bacteria, which was consistent with . . . aspiration meaning things from his stomach and from his mouth had gone down into his lungs into his windpipe." The victim's blood tested positive for the presence of benzodiazepines, which had been given to him on Life Flight, as well as alcohol and cocaine metabolites. The victim had "dysconjugate gaze,"

-4-

meaning "that the eyes are not looking straight forward in the same direction. One is looking a different direction than the other."

Doctor Adams said that despite the severity of his injuries, the victim was not considered brain dead "[b]ecause he still did have some brainstem reflexes, some breathing. He had some eye opening, so some of those last few reflexes were still left." Doctor Adams nevertheless opined that the victim could not have recovered from his injuries to live a normal life. She noted that another doctor found "no response to pain stimuli" on March 10, 2016, indicating "a progression of worsening examination and worsening function." She said that the victim died "quite quickly" after life support was removed on that date.

Stewart County Sheriff's Department Investigator David Evans responded to the scene on Glen Holliday Road in Indian Mound, which he described as a very rural area, but the victim had already been transported from the scene by the time Investigator Evans arrived. Investigator Evans traveled to the hospital, where he photographed the victim. He recalled that the victim was on life support and unconscious. Investigator Evans observed an abrasion on the victim's forehead and a "very bright red, very pushed in" "mark from where the shoelace had been around his neck." Investigator Evans also photographed the victim's tattoos, which photographs he had the Stewart County dispatcher "send out to local agencies asking for help identifying" the victim. A sergeant at the Montgomery County Jail identified the victim from the photographs and also provided Investigator Evans with contact information for the victim's ex-wife and his mother.

Investigator Evans spoke with the victim's mother, who told him that she had spoken with the victim on the previous day. The victim told her that he had worked out with Mr. Lancaster at Planet Fitness in Clarksville. Using the victim's cellular telephone records, Investigator Evans was able to determine the location of the Planet Fitness, and he was able to observe video surveillance of the victim working out with Mr. Lancaster. Planet Fitness personnel provided Investigator Evans with a telephone number for Mr. Lancaster.

Investigator Evans said that the information he gleaned during interviews with Mr. Lancaster and Ms. Valencia led him to interview the defendant. The video recording of that interview was played for the jury.

At the outset of the interview, the defendant confirmed Mr. Lancaster's statement "that there had been some drinking going on and a fight had occurred. [The victim] was drinking heavily and picking fights with folks, and he decided to get him out of there." The defendant told Investigator Evans that he took the victim "for a ride . . .

-5-

and then dropped him back off at the . . . house." When Investigator Evans told the defendant that his version of the events did not make any sense given the victim's condition, the defendant said, "'I wanted to teach him a lesson.'" The defendant told Investigator Evans, "'[Y]ou don't treat family that way,' the way [the victim] was treating the other individuals at the residence." Investigator Evans said that he thought the defendant's statement about family "was in reference to [the victim's] being recently out of the Army and going through a divorce and his friends kind of taking care of him."

The defendant admitted to Investigator Evans "that he drove out to Glen Holliday Road, and once there, put the shoestring around [the victim's] neck, got out of the vehicle to relieve himself, got back into the vehicle, [and] noticed that [the victim] had turned blue." The defendant claimed that "[h]e panicked, pushed [the victim] out of the vehicle, and drove away." Investigator Evans said that he did not think that the defendant's version of events made sense given that the defendant was a soldier with "at least a basic first aid training." The defendant told Investigator Evans that the victim, who weighed approximately 240 or 250 pounds, "had passed out in the front passenger seat" as the defendant drove from Clarksville into Stewart County, which drive took approximately 37 minutes when Investigator Evans drove it.

During the interview, Investigator Evans noticed that the defendant was wearing new shoes with laces that "matched the shoestring that was found around the victim's neck." The defendant told him that he always wore black and green New Balance shoes and that "he had gotten rid of" his old shoes.

Investigator Evans described the victim's murder as "intimate," opining that "it's not spontaneous." He said,

> [T]he shoelace was tied twice, so he had to get behind the victim with that shoelace, wrap it around his neck, not just once, twice, and then put that knot in there, a knot in such a way that you can't get it out. That's very intimate. That tells me that you wanted this guy to die.

The victim died on March 10, 2016, after his family made the decision to withdraw life support. The defendant was then charged with first degree murder, and Investigator Evans brought him in for another interview. During that interview, the defendant related a story similar to that he gave during the first interview. The defendant again told Investigator Evans that he had driven the victim to Glen Holliday Road,

> stopped, got out of the vehicle, went around the vehicle, got into the back passenger seat, got behind [the victim], took the

-6-

shoelace -- because it was there -- wrapped it around his neck, not once, but twice, and then tied the knot. Indicated he got out of the vehicle, relieved himself, came back, the victim . . . was blue at that time. He said he panicked and he pushed him out.

When Investigator Evans asked the defendant why he did not simply cut the string as Mr. Smith had done, the defendant said, "'I just panicked.'"

Investigator Evans suggested that the defendant "had thousands of opportunities to stop" between the victim's residence in Montgomery County and the location where he abandoned the victim. Investigator Evans noted that the defendant told him that he had driven past his father's house going to and from the remote location. Investigator Evans also observed that the defendant's decision to drive 37 minutes to such a remote area and then take the time to remove his shoelace from his shoe indicated to Investigator Evans that the defendant had acted with deliberation. He said that the fact that the defendant then took the time to get into the backseat behind the victim and wrap the shoelace twice indicated to him that the defendant "wasn't . . . trying to scare anybody."

Deputy Chief Medical Examiner Thomas Deering, who performed the victim's autopsy on March 11, 2016, testified that the cause of the victim's death "was hypoxic brain injury due presumably to ligature strangulation." In this case, a ligature "was sufficiently tight to cut off at least" the victim's "internal jugular veins to his head that caused him to pass out, caused him to have a low amount of oxygen going to his brain for a critical amount of time until it caused injury." Doctor Deering added, "It was then the brain injury that led to his death, ultimately. The brain will swell, and other complications happen when people have hypoxic or low oxygen brain injury."

Doctor Deering identified photographs of the ligature injury to the victim's neck that appeared as "two basic linear marks" that were "discontinuous." Doctor Deering said that the "forensic neck dissection is negative," indicating "that this is not a forceful ligature strangulation." He explained that a person could "be strangled without cutting off [the] airway" and that "most of the deaths that are due to ligatures" occur "because either the[] veins or the[] arteries in their neck are closed and that's sufficient." He said that four pounds of pressure would "close the internal jugular vein" and that 10 pounds of pressure would "close the carotid arteries that are present." Doctor Deering testified that, in this case, the ligature was "just tight enough that [it] just closed down the internal jugular veins, and that's sufficient because it wasn't undone." He said that the victim "would have passed out. And there was a period of time where if you'd cut it, he probably would have been alright, but the time went on too long." He said that,

-7-

generally, a ligature of the type present in this case would cause unconsciousness in "six to ten seconds" and death in "a minute or two, or maybe even three." During that time, the victim would "show signs of hypoxic brain injury. And it has an almost seizure look to it." Doctor Deering clarified that, because he did not know how tight the ligature was in this case, he could not provide an accurate estimate on how long it would have been before the victim began to suffer brain damage. He said that "the bottom line on this is that it obviously was enough to cut off internal jugular flow, or he wouldn't have had hypoxic brain injury."

Doctor Deering observed that the lack of signs of manual strangulation or any other significant injuries coupled with "an asphyxia of only the internal jugular veins is something that we really would only see in an intentional hanging or in" cases where the individual "has been stopped from fighting back," such as where the individual is "in a coma," has "been beaten senseless," or "is passed out or drugged or under the influence of something . . . and can't fight back." He noted the presence of alcohol in the victim's blood and said that "[s]omething contributed to this gentleman allowing someone to tie something around his neck that caused him to have hypoxic brain injury, and the only thing that I find is the alcohol." He added, "I mean, there's no reason a healthy man like this couldn't reach up and try to remove this ligature from his own neck."

Doctor Deering agreed during cross-examination that, even if the ligature had not been tied very tight, the movement of the victim's head could have generated enough pressure to cause asphyxiation, particularly given that he was under the influence. He noted during re-direct examination that "the fact that he still has some breathing when" Mr. Smith arrived indicated that the ligature was "not real tight, it's probably not cutting off his carotid arteries, but it is enough to cut off his internal jugular. Even if it's episodically, you know, even if it's in passing out, his head being forward completes enough pressure to cut off his jugular vein."

Convicted felon Joshua Johnson testified that in 2016, he was incarcerated in the same pod as the defendant at the Stewart County Jail. Mr. Johnson claimed that, while they were incarcerated together, the defendant told Mr. Johnson that he had killed a man "[w]ith the shoestring of his shoe." Mr. Johnson said,

> He said that the guy he killed and the other buddy that he knows got into an altercation the night before, and so he took the victim out, got him drunk, and killed him for that altercation. . . . He said he climbed in the back seat, used a shoestring to wrap it around his neck, and when he thought he was dead, he kicked him out of the car and left him on the side of the road.

-8-

Mr. Johnson claimed that the defendant joked about the victim's murder, saying, "Just, like, about tying people up, choking people. I don't really remember because it's been so long ago, but I know it was just a carefree attitude about killing people." Mr. Johnson said that no one had asked him to speak to the defendant, that he had voluntarily reported the defendant's statements to law enforcement, and that he had not received any consideration from the State in exchange for his testimony.

During cross-examination, Mr. Johnson stated that he had "numerous conversations" with the defendant about the victim's murder. He agreed that it was not uncommon for people in jail to lie to appear tougher than they actually are.

The defendant testified that he and the victim went through basic training together in the Army and were roommates in the barracks when they were stationed at Fort Campbell. Approximately two to three months after they were stationed at Fort Campbell, the victim got married and moved out of the barracks. The defendant got married a short time later. He and the victim remained friends and spent a good deal of time together. On March 5, 2016, a fellow soldier called and asked the defendant for a ride "because he had been drinking that night." The defendant went to Mr. Lancaster's residence, picked up the soldier, Noah Fletcher, and drove him home before coming back to the residence to socialize with the others at the party, many of whom he had known since basic training. The defendant said that he was not drinking that night.

At some point, "the fight broke out," and the defendant "was one of them trying to break it up." The defendant said that he intervened in the fight because he did not want Mr. Lancaster and the victim to fight each other, explaining, "I really didn't want anyone fighting. We're all supposed to be brothers, you know. You don't want your family to get hurt, much less family itself." After the fight ended, the victim went to the bathroom, and then the defendant heard "Ms. Valencia in the bathroom saying, 'Get away from me.' She was upset because she had gotten hit." The defendant "went back to the bathroom to see what was going on, what [he] could do to try to help break that up." He said that he "talked [the victim] out of the bathroom." The defendant said that the victim "wasn't in a confrontation with anybody" but that his "state of mind" was such that he did not "really want to listen to anybody." He saw the victim "punch a few holes in the walls" and "punch out some windows." At that point, the defendant decided to take the victim out of the house, and the victim left with him willingly.

The defendant said that they "just went for a ride," and he drove the victim "out to a place where me and some friends of mine from school used to hang out. And when we got there, I realized he was passed out." The defendant insisted that he was "[j]ust trying to get [the victim] out of the house and away from people that he was

-9-

having problems with." He said that he did not want to take the victim "somewhere else where he would wind up getting into it with somebody else who had nothing to do with what was going on" and that he thought if he took the victim to a more peaceful and isolated spot, "[m]aybe he'd wake up and be in a better mood."

The defendant testified that he had not planned to tie the shoelace around the victim's neck, saying, "It's not something I had planned, it's just I wanted to scare him. I was just going to, like, get out of the car and wait for him to wake up and freak out, but I took it one step further than what I should have." He called the victim's murder "[j]ust a prank between friends," saying, "I was going to talk to him, teach him a lesson, and just do the prank between -- just -- something dumb." The defendant insisted that the shoelace "was already out of the shoes" because he "had thrown the shoes away" after he bought a new pair but kept the old laces as "[s]pare strings for the new shoes." He said that he got behind the victim and wrapped the shoelace around the victim's neck twice but said that he did not "know exactly why" he had done so. He said that he did not think he had tied the knot very tightly. The defendant then got out of the car to smoke and to relieve himself. When he got back into the car, the victim was turning blue, so he opened the door and pushed the victim out onto the ground. He said that did not intend to kill the victim and did not intend to leave the victim there to die. He admitted that he lied to his friends afterwards about where he had taken the victim, explaining that he was scared. He also admitted that he initially lied to Investigator Evans.

The defendant denied telling Mr. Johnson that he'd taken the victim out, gotten him drunk, and killed him on purpose. He maintained that he simply panicked and left the victim and that he would trade places with the victim "[i]n a second." The defendant said that although he had a cellular telephone in his possession on the night of the victim's death, the battery was dead and he had no means of charging it.

During cross-examination, the defendant acknowledged that he had abandoned the unconscious victim in a remote location with a shoelace tied twice around his neck. He was aware that the victim's face was turning blue, saying, "I thought he was dead. I freaked out." Although he could have "[e]asily" untied the shoelace, he did not do so because he "wasn't thinking about it." The defendant conceded that he did not stop to call 9-1-1 or ask for assistance in any way. The defendant insisted that he was never inflamed or angry at the victim and that he did not feel threatened by the victim in any way. He claimed that he decided to tie the shoelace around the victim's neck "once we had gotten out there, as a prank." He said that he could not recall when he had changed his mind and decided to prank the victim but said that "it wasn't long before the incident itself had happened."

-10-

The defendant conceded that he had been trained in rendering first aid in battle and live fire situations while in the Army and that he had been able to use that training in other stressful situations. Nevertheless, he did not even think to untie the string around the victim's neck when his face began to turn blue. He said that he originally intended to untie the knot when the victim awoke but "just panicked" when he saw "that he was blue." He insisted, "I was trying to scare him. That's all."

The defendant admitted that he told Mr. Lancaster that he had driven the victim "[d]own the road and dropped him back off at the house," explaining, "I was scared and I just made something up."

Based upon this evidence, the jury convicted the defendant as charged of first degree murder and aggravated assault by strangulation. Because the State had filed a notice of its intent to seek a sentence of life without the possibility of parole, the trial proceeded to a sentencing hearing in front of the jury. At the conclusion of that proceeding, the jury concluded that the State had failed to establish any statutory aggravators and sentenced the defendant to life imprisonment. The trial court merged the defendant's assault conviction into the first degree murder conviction and imposed a single sentence of life imprisonment.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant contends that (1) the trial court erred by admitting into evidence three photographs of the victim taken during his life in violation of the plain language of Code section 40-38-103(4); (2) the trial court's refusal to allow the defendant pretrial access to Mr. Johnson's criminal history deprived him of the right to a fair trial; (3) the trial court should have permitted him to inquire into the victim's previous arrest in Montgomery County; (4) the trial court erred by permitting the prosecutor to state multiple times during his rebuttal argument that the defendant and his counsel were attempting to "trick" the jury; (5) the trial court erred by "not addressing the fine portion of the defendant's sentence or even addressing as to whet[h]er the defendant would waive his right to have a jury affix a fine to any of his convictions"; and (6) the evidence is insufficient to support his conviction of first degree murder.

*I. Photographs*

At trial, the State admitted via the victim's mother three photographs of the victim taken during his life. The defendant objected to the admission of more than one photograph, citing the terms of Code section 40-38-103. The trial court held that Code section 40-38-103 did not prohibit the admission of more than one photograph and that none of the photographs offered by the State was inflammatory.

-11-

Code section 40-38-103 provides, "In a prosecution for any criminal homicide, an appropriate photograph of the victim while alive shall be admissible evidence when offered by the district attorney general to show the general appearance and condition of the victim while alive." T.C.A. § 40-38-103(4)(c). We need not determine whether the statute limits the State to a single photograph because, even if the admission of the photographs in this case was error, it was harmless. *See* Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."); *see also State v. Adams*, 405 S.W.3d 641, 658 (Tenn. 2013) ("Generally, photographs taken during the life of a victim are not so prejudicial as to warrant a new trial.").

## *II. Mr. Johnson's Criminal History*

The defendant claims that the trial court's refusal to require the State to provide him with the criminal history of each of the State's witnesses prior to trial deprived him of the right to a fair trial. The State argues that the trial court did not abuse its discretion.

Prior to trial, the defendant moved the trial court to require the State to produce prior to trial reports for each State witness taken from the National Crime Information Center ("NCIC") database. The State opposed the motion, noting that it was not permitted to run an NCIC check on all of its potential witnesses and that it typically only did so on request of the defendant after the witness had testified on direct. The trial court ruled that the defendant would be entitled to the criminal history of the testifying witnesses after they completed direct examination. The court also indicated that the defendant would be entitled to a break in the trial for the purpose of obtaining and reviewing the history.

Before Mr. Johnson testified, the defendant indicated that he had "been provided a criminal history of Mr. Johnson" and indicated that he would use the lunch recess to review the report. When court reconvened, the State asked the trial court to determine which of Mr. Johnson's convictions would be admissible. At that point, the defendant complained that the late disclosure of Mr. Johnson's NCIC report deprived him of "time to do . . . due diligence to call these people and get clarification on what he was convicted of and what he wasn't convicted of." The trial court allowed defense counsel to question Mr. Johnson under oath about his prior convictions and warned Mr. Johnson that he would be guilty of perjury unless he answered honestly. The defendant indicated that he was "satisfied with that" process and thanked the court "very much for the leniency."

-12-

During the jury-out hearing, Mr. Johnson testified that he had been convicted of felony theft and shoplifting in Henry County; forgery and aggravated burglary in Montgomery County; and theft in Carroll County. Mr. Johnson admitted that he had Calloway County, Kentucky convictions of evading arrest and felony theft. Mr. Johnson admitted that he had been convicted of tampering with a motor vehicle in Missouri, which he described as "[c]ar theft." Although Mr. Johnson said that he had been released from custody on that case in 2007, placing that conviction outside the time limitation for the use of prior convictions for impeachment, the trial court allowed the defendant to use that conviction given the "short notice."

When Mr. Johnson denied having convictions of first degree assault and statutory rape, the defendant stated, "And in fairness, Your Honor, it just says Joshua Johnson, so it's a pretty common name. I know in Clarksville there's three of them." The trial court stated that because the witness denied those convictions, the burden was on the defendant to present evidence to contradict the witness.

At the conclusion of the jury-out hearing, the court and the parties agreed that Mr. Johnson's 2017 Kentucky convictions for felony evading arrest and felony theft, 2012 Henry County convictions for felony theft and shoplifting, 2012 Montgomery County conviction for forgery, and 2002 Missouri conviction for motor vehicle theft could be used for purposes of impeachment.

The defendant now asserts that "he was denied a fair trial through the procedures administered by the trial court." The record, however, indicates that the defendant expressed his satisfaction with the procedure implemented by the trial court. Consequently, he may not now be heard to complain. *See* Tenn. R. App. P. 36(b) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Moreover, because the defendant failed to support his argument with citations to relevant authorities, it is waived. *See* Tenn. Ct. Crim. App. R. 10(b).

*III. Victim's Arrest*

The defendant asserts that the trial court erred by refusing to allow him to inquire into the details of the victim's previous arrest, claiming that the evidence was relevant to establish how the Montgomery County jail came to possess photographs of the victim's tattoos. The State avers that the trial court did not abuse its discretion because evidence of the victim's prior arrest was irrelevant.

-13-

Before his cross-examination of Investigator Evans, the defendant moved the trial court to allow him to ask Investigator Evans how the Montgomery County jail came to possess photographs of the victim's tattoos. Specifically, the defendant wanted to ask about the victim's having been arrested for domestic violence, arguing that the State "opened the door as to how they identified him and that a member of the Montgomery County jail was the one who identified him." The trial court deemed the evidence irrelevant, finding "that the fact that this witness has testified that he had sought the assistance of the Montgomery County officials in helping to identify the victim by the use of tattoos" did not open "the door to get into the victim's criminal history." The court deemed any connection between the victim's arrest and his murder "very, very tenuous" and concluded that, as a result, evidence of the victim's arrest did not "make[] any of the issues before this court more or less likely."

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible." Tenn. R. Evid. 402. Questions concerning evidentiary relevance rest within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion in the absence of a clear abuse appearing on the face of the record. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)).

That the victim had been previously arrested in Montgomery County made no fact of consequence in the defendant's trial more or less likely. The defendant did not claim that the victim was the first aggressor, which might have made a prior allegation of domestic violence relevant to the victim's propensity for violence. Contrary to the defendant's assertion, there was no reason for the "context of which the pictures were taken" to be explained to the jury. In consequence, the trial court correctly excluded any evidence related to the victim's prior arrest.

*IV. Closing Argument*

The defendant contends that the trial court erred by permitting the prosecutor "to accuse the defendant and defendant's counsel of trying to trick the jury despite pretrial motions for the State of Tennessee not to express its personal opinion about the defendant or his counsel." The State asserts that the defendant waived plenary consideration of the error by failing to lodge a contemporaneous objection to the

statement.  The State also avers that the prosecutor's argument was not improper and that, even if it was, the defendant failed to establish entitlement to relief.

During his closing argument, defense counsel, referring to Mr. Johnson, stated:

> He has committed forgeries where he has tried to trick people and say, hey, this check or whatever it was is good, you take it.  The same thing to you guys.  The same thing to the DA's office.  Just tricks.  That's what he does.  That's what he has always done.

The prosecutor then began his rebuttal argument with the following statement:  "The only trick in this trial is the [d]efendant's attorney and the [d]efendant trying to convince you that tying a string around the man's neck until he dies is a prank.  And that's true."  Contrary to the State's assertion, this was not the only instance of the State's asserting that the defense was trying to trick the jury.  The prosecutor also made the following comments:

> The [d]efendant wants you to believe that Joshua Johnson took the stand and played a trick on you, on the State, on the Court.

> At the same time he wants you to believe that taking a shoelace out of a shoe and wrapping it around a man's neck is an accident? . . . That's a trick.  Don't fall for that.

> . . . .

> . . . . Lancaster was furious that [the defendant] executed [the victim].  This was an execution, not an accident.  Do not be tricked.

> . . . . It's disgusting to think that a trick is being played in this courtroom.  That's to convince you that somebody could accidentally gouge a man's throat with a rope and call it a prank.  . . . .

> I was taking notes during that closing argument, and then I just stopped because sometimes I just -- you call it what it is.  You try to rebut some points, and then you stop

-15-

and just say, let's be honest here, this ain't no prank. This is
an execution and I'm sick of hearing the word accident.

. . . .

That's no brother. That's hate. That is hate. Not a
single person in this room with a brother or a sister who they
love would push them out of a car upon seeing them turn
blue. Think about that. That is a trick they're trying to play
upon you.

Though not specifically challenged by the defendant, the prosecutor also made the
following questionable comment:

. . . . Ladies and gentlemen, the guilty flee. The
righteous are bold like a lion. That's the distinction you have
to draw. . . . In this case, he is not righteous, he is guilty of
premeditated first degree murder.

The State contends that the defendant waived plenary review of the issue by
failing to lodge a contemporaneous objection to any of the challenged commentary. The
defendant asserts that a contemporaneous objection was not necessary because he had
secured a pretrial ruling prohibiting the prosecutor from expressing his personal opinion
about the defendant or his counsel. *See State v. McGhee*, 746 S.W.2d 460, 462 (Tenn.
1988) (stating that securing a clear and definitive ruling via a pretrial motion to suppress
or motion in limine obviates the need for a contemporaneous objection to preserve the
issue for appellate review); *see also State v. Alder*, 71 S.W.3d 299, 302 (Tenn. Crim.
App. 2001). He also notes that he raised the issue in his motion for new trial. In *State v.
Hawkins*, our supreme court "appl[ied] plenary review, rather than plain-error review, to
the . . . alleged instances of improper prosecutorial argument raised in the motion for new
trial" even though Hawkins "did not contemporaneously object to any of the alleged
instances of improper prosecutorial argument." *State v. Hawkins*, 519 S.W.3d 1, 48
(Tenn. 2017). Under these circumstances, we will apply plenary review to the
defendant's claim of improper closing argument.

"While the scope and depth of closing argument is generally a matter
within the trial court's discretion, the State is not free to do what they wish," *State v.
Jones*, 568 S.W.3d 101, 145 (Tenn. 2019) (citation omitted), and judges must take care to
restrict improper argument, *see State v. Hill*, 333 S.W.3d 106, 130-31 (Tenn. Crim. App.
2010) (citation omitted). Because of the State's unique role in a criminal case, the State,
in particular, "must refrain from argument designed to inflame the jury and should restrict

its commentary to matters in evidence or issues at trial." *Hill*, 333 S.W.3d at 131. Our supreme court

> has recognized five general areas of potential prosecutorial misconduct during closing arguments: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused; and (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge.

*Jones*, 568 S.W.3d at 145 (citing *State v. Goltz,* 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003)).

Contrary to the State's assertion that the prosecutor's use of the word "trick" was isolated and designed to answer defense counsel's characterization of Mr. Johnson's testimony, the record establishes that a cornerstone of the prosecutor's rebuttal was his insistence that the defense was trying to "trick" the jury into believing a lie. "The prosecution is not permitted to reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial." *State v. Gann*, 251 S.W.3d 446, 460 (Tenn. Crim. App. 2007) (citing *Dupree v. State*, 410 S.W.2d 890, 892 (Tenn. 1967); *Moore v. State*, 17 S.W.2d 30, 35 (Tenn. 1929); *Watkins v. State*, 203 S.W. 344, 346 (Tenn. 1918); *McCracken v. State*, 489 S.W.2d 48, 50 (Tenn. Crim. App. 1972)). The prosecutor also injected his personal opinion about the veracity of the defendant's version of the offense, saying, "[L]et's be honest here, this ain't no prank. This is an execution and I'm sick of hearing the word accident." *See State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); *see also State v. Hall*, 976 S.W.2d 121 (Tenn. 1998); *State v. Henley*, 774 S.W.2d 908, 911 (Tenn. 1989). He also improperly expressed his anger and disgust with the defendant. *See State v. Goltz*, 111 S.W.3d 1, 7 (Tenn. Crim. App. 2003). The prosecutor argued facts not in evidence when he stated that Mr. "Lancaster was furious that [the defendant] executed [the victim]." The prosecutor also injected issues broader than the defendant's guilt by stating that the defendant had betrayed his brother in arms, "That's no brother. That's hate. That is hate. Not a single person in this room with a brother or a sister who they love would push them out of a car upon seeing them turn blue. Think about that." Finally, the prosecutor made an improper reference to religious law, which "has been disapproved in this State." *See State v. Stephenson*, 878 S.W.2d 530, 541 (Tenn. 1994), *abrogated on other grounds by State v. Saylor*, 117 S.W.3d 239 (Tenn. 2003). Although some of the "objectionable content was invited by

or was responsive to the" defendant's closing argument, *Darden v. Wainwright*, 477 U.S. 168, 182 (1986), that is no excuse for the flagrant impropriety here. Our supreme court has emphasized "that prosecutors must balance zealous advocacy with their obligations to seek justice and ensure that defendants receive fair trials" and "urge[d] prosecutors to err on the side of restraint and temperance when presenting closing arguments." *Hawkins*, 519 S.W.3d at 50 (citations omitted).

Even inappropriate closing argument will not warrant a new trial unless it was so inflammatory or improper as to affect the verdict. *See Hill*, 333 S.W.2d at 131 (citation omitted); *see also Jones*, 568 S.W.3d at 145 ("In other words, [improper argument] will be reversible error if the improper comments of the prosecutor were so improper or the argument so inflammatory that it affected the verdict."). An appellate court considering the harmful effect of improper closing argument examines the following factors:

> (1) The conduct complained of viewed in the context and in light of the facts and circumstances of the case[;]
>
> (2) [t]he curative measures undertaken by the court and the prosecution[;]
>
> (3) [t]he intent of the prosecutor in making the improper statements[;]
>
> (4) [t]he cumulative effect of the improper conduct and any other errors in the record[; and]
>
> (5) [t]he relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

As indicated above, many of the improper comments were made in response to defense counsel's closing argument. "[T]he idea of 'invited response' is used not to excuse improper comments, but to determine their effect on the trial as a whole." *Darden*, 477 U.S. at 182. Viewing the remarks in this case in the context of an "invited response" and examining them in light of the record as a whole, we cannot say that the improper argument was "so inflammatory or improper as to affect the verdict." *See Hill*, 333 S.W.2d at 131 (citation omitted). The facts of the case were largely uncontroverted, and the defendant's claim that he wrapped the shoelace around the victim's neck and then left the blue-faced victim alone in the middle of nowhere in the dead of night to die as a "prank" simply strained the bounds of credulity.

*V. Fine*

The defendant contends that the trial court erred by failing to determine whether the defendant wished to waive his right to have the jury affix the fine and by failing to address the issue of a fine altogether. He asks this court to declare his sentence void on the basis of the alleged error. The defendant's argument is perplexing given that he received the only statutorily available sentence for his conviction and that no fine was imposed. Moreover, he failed to support his argument with citation to any authority, and, in consequence, it is waived. *See* Tenn. Ct. Crim. App. R. 10(b).

*VI. Sufficiency*

Finally, the defendant challenges the sufficiency of the convicting evidence, arguing that the State failed to establish the element of premeditation. He concedes that the proof adduced at trial supports, at most, a conviction of second degree murder.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[f]irst degree murder is . . . [a] premeditated and intentional killing of another." T.C.A. § 39-13-202 (2006). As used in the statute,

> "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not

-19-

necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d).

Noting that "[p]roof of premeditation is inherently circumstantial," this court has observed that "[t]he trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime." *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007). Thus, when evaluating the sufficiency of proof of premeditation, the appellate court may look to the circumstances surrounding the killing. *See, e.g.*, *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001). Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime[;] and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660.

The evidence adduced at trial established that the defendant attended a party at Mr. Lancaster's residence and that the victim, who was a friend of both the defendant and Mr. Lancaster and who was living with Mr. Lancaster at the time, became extremely intoxicated during the party. At some point, a fight broke out among the inebriated partygoers, and the defendant helped diffuse the situation. The victim was very upset about the disintegration of his marriage. The defendant, who did not drink any alcohol that night, offered to take the victim away from the residence to cool down. The victim willingly left the residence with the defendant. On the following morning, Mr. Smith discovered the victim in a remote area of Stewart County with a shoelace wrapped around his neck. The victim, who was struggling to breathe, was taken via helicopter to Vanderbilt University Medical Center, where he succumbed to his injuries four days later. Doctor Deering testified that the cause of death "was hypoxic brain injury due presumably to ligature strangulation." The defendant admitted that he drove the victim, who had passed out due to intoxication, to the remote area and that he got into the back seat to wrap the lace of his running shoe around the victim's neck. After the victim's face began to turn blue, the defendant pushed the victim out of the car and left him for dead in the middle of the road. He then lied to Mr. Lancaster about the victim's whereabouts and initially lied to Investigator Evans about his involvement in the victim's death. The defendant claimed that he did not intend to kill the victim. Instead, he

claimed that the victim's death was the accidental result of a prank gone awry. He maintained that he had driven the victim into the middle of nowhere and wrapped the shoelace around his neck to teach the victim a lesson about his mistreatment of Mr. Lancaster and Ms. Valencia. He asserts that the State presented no evidence to contradict his claim. The jury, however, as the judge of "the law and the facts," may accept or reject any evidence "no matter how uncontroverted or uncontested a particular fact or element may appear." *State v. Thorpe*, 463 S.W.3d 851, 862-63 (Tenn. 2015) (quoting *State v. Richmond*, 90 S.W.3d 648, 660 (Tenn. 2002)) (internal quotation marks omitted).

In our view, the evidence of the defendant's calm and sober demeanor when he drove the victim into the middle of nowhere and got into the backseat to fasten the shoelace around the victim's neck when coupled with the fact that the defendant pushed the victim, who was by then beginning to turn blue from lack of oxygen, out of the car with no hope of rescue establishes that he acted in a manner sufficient to satisfy the elements of intent and premeditation.

## VII. Clerical Error

As indicated, the trial court merged the defendant's conviction for aggravated assault by strangulation into his conviction of first degree murder and imposed a sentence of life imprisonment. The judgment for the aggravated assault conviction contains no mention of the merger and reflects a sentence of life imprisonment, which is statutorily unavailable for a conviction of aggravated assault. In consequence, the case must be remanded for the entry of a corrected judgment reflecting the merger of the convictions.

## VIII. Conclusion

Based upon the foregoing analysis, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE